IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| ALESHA P. THOMAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:12-CV-971-WKW |
| | ) | [WO] |
| AUTAUGA COUNTY BOARD | ) | |
| OF EDUCATION, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Alesha P. Thomas, a teacher formerly employed by Defendant Autauga County Board of Education (the "Board"), brought this suit under Title VII of the Civil Rights Act and 42 U.S.C. §§ 1981 and 1983, alleging that she suffered racial discrimination, a hostile work environment, and retaliation. Before the court is the Board's motion for summary judgment on all claims. Plaintiff has withdrawn her claim of racial discrimination. The motion has been fully briefed. (Docs. # 15, 16, 20, 21, 22.)[1] Upon consideration of the parties' arguments, the record evidence, and relevant law, the court concludes that the motion is due to be granted.

---

[1] All citations to pages in briefs are to page numbers generated by CM/ECF. All citations to page numbers in deposition testimony are to page numbers created by the court reporter who prepared the depositions submitted in the record.

# I.  JURISDICTION AND VENUE

The court exercises subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.  Personal jurisdiction and venue are uncontested.

# II.  STANDARD OF REVIEW

To succeed on summary judgment, the movant must demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The court must view the evidence and the inferences from that evidence in the light most favorable to the nonmovant.  *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  This responsibility includes identifying the portions of the record illustrating the absence of a genuine dispute of material fact.  *Id.*; Fed. R. Civ. P. 56(c)(1)(A).  Or, the movant can assert, without citing the record, that the nonmoving party "cannot produce admissible evidence to support" a material fact.  Fed. R. Civ. P. 56(c)(1)(B).  If the movant meets its burden, the burden shifts to the nonmoving party to establish – with evidence beyond the pleadings – that a genuine dispute material to each of its claims for relief exists.  *Celotex*, 477 U.S. at 324.  A genuine dispute of material fact exists when the nonmoving party produces evidence allowing a reasonable fact

finder to return a verdict in its favor.  *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001).

## III. BACKGROUND

### A.  <u>Facts</u>

Ms. Thomas is a black female.  She was non-tenured during her employment with the Board.[2]  The Board hired Ms. Thomas as a science teacher at Marbury Middle School ("Marbury") at the beginning of the 2009-10 school year.  Greg Faulkner was superintendent at that time, and Billy Hollon was principal at Marbury.  During the 2010-11 school year, Jason Wingate was principal, and Julie Weston was assistant principal.  During Ms. Thomas's final year as a Board employee in 2011-12, Ms. Weston was principal, and Jeremy Seamon was assistant principal.  Both Ms. Weston and Mr. Seamon are white.  Near the end of the 2011-12 school year, Spence Agee became school superintendent.

The majority of Ms. Thomas's complaints about her employment at Marbury relate to her dealings with a white female co-teacher, Jennifer Jacobs, and later, with her principal, Ms. Weston.

---

[2] Alabama law provides that "a teacher . . . shall attain tenure upon the completion of three complete, consecutive school years of full-time employment as a teacher with the same employer unless the governing board approves and issues written notice of termination to the teacher on or before the last day of the teacher's third consecutive, complete school year of employment."  Ala. Code § 16-24C-4(1).

1.     *Issues with Ms. Jacobs*

Ms. Thomas and Ms. Jacobs had difficulty working together from the beginning of Ms. Thomas's tenure.  As a result, Ms. Thomas documented her interactions with Ms. Jacobs.   (*See* Doc. # 15-3.) Ms. Jacobs offended and demeaned Ms. Thomas in various ways during Ms. Thomas's employment at Marbury.

**a.     Outbursts**

Ms. Jacobs was a difficult person to work with.  In the fall of 2009, Ms. Jacobs yelled at Ms. Thomas and told her that she was not a good teacher.  Ms. Thomas reported the incident to Mr. Wingate but told him that she believed the matter could be resolved without his intervention.[3]   In 2011, after a student reported to Ms. Jacobs that Ms. Thomas was planning a field trip, Ms. Jacobs angrily confronted Ms. Thomas, alleging that the field trip was unauthorized. Later, in response to her angst about the field trip, Ms. Jacobs interrupted Ms. Thomas's conversation with another teacher in the lunchroom, shouted "That's it!", and stormed away.  While Ms. Jacobs acted in an angry or threatening manner in each instance, Ms. Thomas admits that Ms. Jacobs never said racially offensive things to or about her.

---

[3] The record is not clear, but it is assumed that Mr. Wingate was assistant principal in the fall of 2009 when Mr. Hollon was principal.

### b.    Inappropriate Remarks

Ms. Jacobs remarked less emotionally to Ms. Thomas on more than one occasion that Ms. Thomas should be a lobbyist – not a teacher.  It is unclear exactly what Ms. Jacobs meant by her remark.  At various times in the spring of 2011, Ms. Jacobs commented to Ms. Thomas that she was "way too hot" to be a teacher, (Doc. # 15-3), and that she was good at throwing parties, but not good at teaching.  Ms. Thomas admits that none of these comments was expressly related to Ms. Thomas's race, but she interprets the comments about partying as "demeaning," as if Ms. Jacobs was really saying that black people "cannot be smart and [be] teacher[s]."  (Thomas Dep., Doc. # 15-1, at 28.)  Ms. Thomas asked Ms. Jacobs to stop making these sort of remarks.

Ms. Jacobs reportedly asked Ms. Thomas when she was going to have children and told Ms. Thomas that she should have some because she looked like the type of woman who would have two children.  Ms. Thomas told her that the comments were unprofessional and asked her to please refrain from asking questions about her personal life.  At other times, Ms. Jacobs poked fun at Ms. Thomas for watching her weight and trying to maintain her health.  Although the comments were unwelcome, Ms. Thomas admits that no comment was racially derogatory.

### c.     Planning Period Interference and Confrontation

At the beginning of the 2011-12 school year, Ms. Jacobs noticed that Ms. Thomas had a particular planning period that was longer than Ms. Jacobs's planning period.[4]  Ms. Jacobs reported to Ms. Thomas that she (Ms. Jacobs) asked Ms. Weston to give her the longer planning period, too.  Ms. Thomas interpreted Ms. Jacobs's interest in and comment about Ms. Thomas's originally assigned planning period as "somewhat racially derogatory."  She explained, "I think [Ms. Jacobs] [wa]s saying that [because she's] a Caucasian female, [she] should have [a] longer time than [me]; ha, ha, ha, you're going to have a shorter time than me" and "have to work harder."  (Thomas Dep., Doc. # 15-1, at 33–34.)

As things turned out, Ms. Thomas got the shorter planning period, and Ms. Jacobs got the longer planning period after the school schedule was modified.[5] Ms. Jacobs came to Ms. Thomas's classroom on August 11, 2011, to tell Ms. Thomas that she was getting the longer planning period.  Ms. Thomas believes Ms. Jacobs wanted her to believe that Ms. Weston was showing favoritism.  While she was visiting, Ms. Jacobs ended up crying, but it is not clear from Ms. Thomas's

---

[4] Every teacher apparently gets a planning period at some point in the school day.  But because of the school schedule, fifth period is longer than other periods, and therefore, the more coveted time for an assigned planning period.

[5] Ms. Thomas later asked Ms. Weston about whether Ms. Jacobs was responsible for the change, and Ms. Weston claims that she did not know what Ms. Thomas was talking about.  Ms. Weston explained that changes to planning periods were made on the basis of class sizes and not teachers' requests.

notes or her deposition testimony why Ms. Jacobs was upset.   Ms. Thomas described Ms. Jacobs as growing angry during the visit, having a red face, and squinting at Ms. Thomas with an evil look.   Ms. Jacobs told Ms. Thomas that she came from a violent and hot-tempered Italian family.   Ms. Jacobs used an "intimidating" voice to tell Ms. Thomas that if Ms. Thomas wanted to use Ms. Jacobs's refrigerator to store her diet soda and Lean Cuisine entrees, she could. (Thomas Dep., Doc. # 15-1, at 37–38.)   Ms. Thomas does not believe that Ms. Jacobs's intent was to be generous.   Ms. Thomas said nothing to Ms. Jacobs in response because she felt scared.   She alleges that Ms. Jacobs was trying to bully, and intimidate her.   Ms. Thomas offers no explanation for how this strange encounter in her classroom was racially derogatory, other than noting that Ms. Jacobs is white and Ms. Thomas is black.   (Thomas Dep., Doc. # 15-1, at 43 ("I'm a black female, and this is a white female using a loud, harsh tone, basically bullying me, scaring me, and I think that's derogatory.").)

### d.   Summary of Harassment from Ms. Jacobs

On the whole, Ms. Thomas finds Ms. Jacobs's remarks and conduct to be professionally objectionable, and subjectively, racially derogatory, because Ms. Jacobs did not say similar things to white teachers at Marbury.   Ms. Thomas acknowledges that she never observed Ms. Jacobs treating other black teachers inappropriately.   Ms. Jacobs's continued conduct is discussed separately in the

context of how it was reported to Ms. Weston during the 2011-12 academic year. *See infra* Part III.A.3.

### 2.    *KKK and April's Fools Day Incidents in the Spring of 2011*

In April 2011, Ms. Thomas found writing and a diagram in a textbook, presumably by a student, that was objectively racially offensive.  She describes it as a drawing of her hanging from a tree by a noose.  The perpetrator-illustrator also wrote, "Ha, ha, ha, Ms. Thomas is pretty, but she's dead.  The KKK is coming to get her."  (Thomas Dep., Doc. #15-1, at 69.)  On April 28, 2011, Ms. Thomas reported what she found to Ms. Weston, who was assistant principal at the time. Ms. Thomas says that the writing and drawing were deeply hurtful, as well as frightening to her.  That is, Ms. Thomas interpreted the drawing and message as a threat from a student or students that she should be hung by the KKK.  Ms. Weston commented that students wrote all sorts of other things in the textbook, including complimentary things.  (*See* Thomas Dep., Doc. # 20-1, at 71 ("[Ms. Weston] tried to kind of make that seem miniscule; and she's like, you see all the other stuff that's written in here?  . . . [T]hey're saying that you're pretty.").)  Ms. Thomas says that Ms. Weston erased the picture from the book, kept the book, and took no investigative or responsive actions.[6]

---

[6] For the sake of simplicity, this entire episode, including the noose drawing, the written threat, and Ms. Weston's response will be called "the KKK incident."

Ms. Thomas also claims that on April Fools' Day, Ms. Weston recruited a white male student to feign passing out in the classroom as a prank on Ms. Thomas.  When Ms. Thomas told the student she would refer him to the principal, the student said it was Ms. Weston's idea.  Ms. Weston denies any involvement in directing a student to play a trick.[7]

After the KKK incident and the April Fools' Day stunt, Ms. Thomas claims that she began to lose confidence in Ms. Weston's ability to take her complaints seriously.

### 3.    *Dealings with Ms. Weston as Principal – 2011-12 School Year*

Ms. Weston became the principal at Marbury at the beginning of the 2011-12 school year.  Before school started, she observed Ms. Thomas sitting alone pouting at a teacher in-service meeting and asked her what was wrong.[8]  Ms. Thomas told Ms. Weston that she would like to talk later.  When Ms. Weston went to Ms. Thomas's classroom, Ms. Thomas declined to discuss what was bothering her.  Ms. Thomas says she did not want to be perceived as a complainer.

---

[7] Ms. Weston does remember the April Fools' Day incident happening, however, because "Ms. Thomas totally fell apart in her classroom" and the school nurse had to tell Ms. Weston what happened.  (Weston Dep., Doc. # 20-2, at 126.)  Ms. Weston says she tried to console Ms. Thomas that it was just a middle school boy acting out in class.

[8] "Pouting" is how Ms. Weston describes Ms. Thomas's behavior.  Ms. Weston also stated in her deposition that it was common for Ms. Thomas to sit alone at lunch, away from the other faculty.

A few days later on the first day of school, August 15, 2011, Ms. Weston removed a sign from Ms. Thomas's classroom door that read:

> I teach 7th
> Grade it takes
> a lot to scare
> me.  I am the
> Terminator.
> Ms. Thomas.

(Doc. # 15-6.)  Ms. Thomas explains that the sign was meant to be read by her students and that she placed it on the door "[b]ecause I wanted students to know that I don't tolerate bullying.  It was not a sign to literally say that I am the terminator like that.  It was a sign that I terminate problems and I don't allow bullying in my classroom."  (Thomas Dep., Doc. # 15-1, at 52; *see also* Thomas Dep., at 71 (explaining that her "Terminator" sign was on her door to deter students from bullying her as previous students had bullied her, albeit anonymously, with the KKK threat).)  Ms. Weston told Ms. Thomas that the sign was inappropriate and Ms. Thomas apologized.  At this time, Ms. Weston began to document on her computer her experiences with Ms. Thomas and other "erratic behavior" that she observed.  (Weston Dep., Doc. # 15-5, at 4–5.)

On the second day of school, August 16, 2011, a student and his mother met with Ms. Weston to request that the student be removed from Ms. Thomas's homeroom on the basis of her treatment of him and inappropriate statements that she allegedly made to the entire class.  Ms. Weston documented the complaint and

10

what the student reported.  (*See* Doc. # 15-7.)  The student claimed that Ms. Thomas told the class that she had been in the military, was not afraid of them, and "would go crazy on them."  (Doc. # 15-7.)  She also allegedly yelled at the student when he corrected her for calling him the wrong name.

The same day, Ms. Thomas came to Ms. Weston and presented three pages of written complaints about Ms. Jacobs's behavior toward her.  Things had come to a head for Ms. Thomas after Ms. Jacobs had visited her classroom to talk about the planning period and gotten angry.  Ms. Weston proposed a meeting with Ms. Jacobs, and Ms. Thomas consented.  On August 17, 2011, the three met together; Ms. Thomas aired her grievances; and Ms. Jacobs apologized.  Ms. Weston suggested that the two teachers only speak to one another about work and to communicate via email.  After Ms. Jacobs left the meeting, Ms. Weston told Ms. Thomas to please communicate any more concerns going forward.  Ms. Thomas did not communicate that she believed Ms. Jacobs's mistreatment of her was based on race.  Ms. Thomas says that she went back to Ms. Weston's office the same day to "discuss the race thing," but chose not to because Ms. Weston "was not very receptive to [her] once [she] went back."  (Thomas Dep., Doc. # 15-1, at 62.)

On August 30, 2011, an employee at Auburn University Montgomery contacted Ms. Weston via email to tell her that she and an education student had visited Marbury's website and noticed that Ms. Thomas's teacher webpage

contained six misspelled words.  (Doc. # 15-8.)  Ms. Weston promptly told Ms. Thomas about the errors.

In September 2011, Ms. Thomas contacted the Board's Director of Pupil Personnel Services, Angel Garrett, to say that she felt that she was being bullied at Marbury because of her race.  Ms. Thomas chose to speak to Ms. Garrett rather than Nancy Jackson, the Personnel Director, because Ms. Garrett is black.  Ms. Jackson is white.  Ms. Garrett responded by sending Ms. Thomas a letter on September 19, 2011, documenting Ms. Thomas's reported concern that she was "being bullied or harassed based on [her] race" by Ms. Jacobs.  (Doc. # 15-9.) Enclosed with the letter was a copy of the Board's policy against harassment.  Ms. Garrett's letter advised that Ms. Thomas's information would be forwarded to Ms. Jackson.  Ms. Thomas expressed her concern that her complaint might compromise her aspirations of gaining tenure at the end of the school year, but Ms. Garrett assured her that the Board follows an anti-retaliation policy.  The record is unclear whether Ms. Weston knew from Ms. Garrett that Ms. Thomas was complaining of racially motivated bullying by Ms. Jacobs, but the record is clear that Ms. Weston knew that Ms. Thomas had communicated with Ms. Garrett and that Ms. Garrett responded in writing.  Ms. Weston delivered Ms. Garrett's letter to Ms. Thomas.

Also on September 19, 2011, Ms. Weston conducted a short classroom walk-through evaluation of Ms. Thomas's seventh-period elective class.   The

walk-through evaluations were typical at Marbury and not exclusively directed at Ms. Thomas.  Ms. Weston noted deficiencies, which Ms. Thomas later defended.

On September 20, 2011, Ms. Thomas emailed Ms. Weston to request a meeting to "discuss [her] feelings and get them out, so that [they] could move on with th[e] school year."  (Doc. # 15-12.)  Ms. Thomas hesitated to request the meeting because she did not want to be a complainer.  Ms. Weston responded promptly and invited Mr. Seamon to attend the meeting.  At the meeting, Ms. Thomas asserted that she felt the August 17, 2011 meeting with Ms. Jacobs had been one-sided and that Ms. Weston did not take her complaint about Ms. Jacobs seriously.  Ms. Weston reminded Ms. Thomas that she had promptly addressed the concerns with Ms. Jacobs.  Ms. Thomas lodged new complaints that Ms. Jacobs had recently kept Ms. Thomas's students in Ms. Jacobs's classroom and made them arrive later for Ms. Thomas's class.[9]  Ms. Thomas further complained that Ms. Jacobs tried to "sabotage and take over" a career fair that Ms. Thomas scheduled in her capacity as student council advisor.  (Thomas Dep., Doc. # 15-1, at 84.)  Ms. Thomas testified at her deposition that she found both instances of Ms. Jacobs's interference to be indicative of Ms. Jacobs's intent not to respect her as a co-teacher and as the student council advisor.  (Thomas Dep., Doc. # 15-1, at 84–85 (explaining that Ms. Jacobs's defiance of Ms. Thomas's schedule "seem[ed]

---

[9] The Board points out that Ms. Jacobs's behavior adversely affected other teachers, too, and not just Ms. Thomas.

like she [was] saying, I'm a Caucasian female, I'm not listening to you . . . ." because Ms. Thomas, a black female, was in charge).)  It is unclear from the record whether Ms. Thomas mentioned in the meeting her belief that Ms. Jacobs was discriminating on the basis of race.  Ms. Weston's notes only reflect Ms. Thomas's new complaints about Ms. Jacobs, but not Ms. Thomas's perception of racially-based harassment.  (*See* Doc. # 15-13.)

Ms. Thomas also reported that she feared that Ms. Jacobs would turn other teachers against her because she had overheard Ms. Jacobs telling someone about the August 17, 2011 meeting.  Ms. Weston responded by encouraging Ms. Thomas that there were many agreeable people on the faculty at Marbury.  Ms. Weston apparently placated Ms. Thomas, because after the meeting, Ms. Thomas informed Ms. Garrett that she felt better about the situation.   Ms. Garrett advised Ms. Thomas that she would tell Ms. Jackson that an investigation would be unnecessary and that Ms. Thomas could contact Ms. Jackson if she changed her mind.  (Doc. # 15-14.)

In November 2011, Ms. Thomas reported to Mr. Seamon and Ms. Weston that a female student claimed that she was being molested by her father.  As part of Marbury's assistance to law enforcement, Ms. Weston summoned Ms. Thomas to the office to give her statement to the police.  Ms. Weston claims Ms. Thomas came in the office in front of the officers repeatedly asking, "Am I in trouble?"

(Weston Dep., Doc. # 20-2, at 87.)   In light of the circumstances, Ms. Weston found Ms. Thomas's reaction to be "bizarre" and "extremely unprofessional." (Weston Dep., Doc. # 20-2, at 87–88.)

On December 15, 2011, Ms. Weston and Mr. Seamon summoned Ms. Thomas for a meeting to address concerns held by Ms. Weston regarding Ms. Thomas's professional conduct.   First, Ms. Thomas had prepared many work-related documents, besides her school webpage, with capitalization, spelling, and grammatical errors.   Secondly, Ms. Thomas had failed to follow proper protocol when she bypassed Marbury administration and complained the Board's Central Office about a school-based decision regarding finances of a student club.   Third, Ms. Weston had become aware that Ms. Thomas had spoken poorly of Ms. Weston and Mr. Seamon to other faculty at Marbury, calling them racists and complaining that Marbury had not celebrated or honored her graduation from a graduate degree program.[10]   Ms. Weston explained how each of these issues reflected a lack of professionalism.   After the meeting, Ms. Weston memorialized the substance of their meeting in a "letter of concern" dated December 16, 2011.  (*See* Doc. # 15-17.)

---

[10] Ms. Weston explained during her deposition that a black teacher named Ms. Smiley came to her in September 2011 to report her (Ms. Smiley's) belief that Ms. Thomas "was trying to make things at work a racial issue."  (Weston Dep., Doc. # 20-2, at 50.)  In November 2011, Ms. Smiley reported again that Ms. Thomas had been calling Ms. Weston and Mr. Seamon racists for quite a while.  Ms. Thomas denies telling Ms. Smiley that Ms. Weston and Mr. Seamon were racists but acknowledges that she spoke to Ms. Smiley about feeling uncomfortable at Marbury.

During the meeting, Ms. Thomas cried and told Ms. Weston that her attorney would be in contact and that her uncle worked for the Alabama Education Association. She accused Ms. Weston of attempting to "pink slip" her for complaining about Ms. Jacobs earlier during the school year. Ms. Thomas says she became upset because Ms. Weston raised the concerns without warning. Ms. Thomas points out Ms. Weston's admission that other faculty made grammatical mistakes that Ms. Weston would correct without counseling the teachers. Ms. Thomas admits calling a Board employee about accounting procedures and complaining about the administration not celebrating her graduation with a card or other memento.[11] Ms. Thomas maintains that her graduation was not honored because she is black. (*See* Thomas Dep., Doc. # 15-1, at 114.)

There are two other events involving Ms. Weston about which Ms. Thomas complains but for which there is not a clear chronological reference. She says that administrators removed a disruptive student from a white teacher's class to her class near the end of the school year, presumably as punishment to Ms.Thomas. Also, Ms. Thomas described an event where she ran excitedly toward the school because she was joyful about an upcoming school pageant. Ms. Weston asked her if she was okay. Ms. Thomas says that the way Ms. Weston asked if she was okay was racially demeaning as though something was wrong with Ms. Thomas.

---

[11] Ms. Weston explains that Marbury's faculty courtesy guidelines included acknowledgement of only bereavement, overnight hospitalization, or the birth of a child.

(Thomas Dep., Doc. # 15-1, at 191 (explaining that Ms. Weston acted "[l]ike I had a problem . . . because I'm excited about helping children").)

### 4.    *First EEOC Charge*

About two weeks after the December 15, 2011 meeting with Ms. Weston and Mr. Seamon, Ms. Thomas filed an EEOC charge on December 28, 2011. (Doc. # 15-18.)  Ms. Thomas set up a meeting with Ms. Jackson and other Board officials for January 5, 2012, to specifically discuss discrimination, hostile work environment, and retaliation, but on January 3, 2012, she cancelled the meeting and told Ms. Jackson, "A Federal Agency is to review my concerns at this time." (Doc. # 20-11.)  Ms. Thomas posits that as early as January 6, 2012, Ms. Weston was aware that "Ms. Thomas was trying to cook something up against the school." (Doc. # 20-13 (internal quotation marks omitted).)[12]  Ms. Weston testified at her deposition that she did not recall precisely when she became aware of the EEOC charge, but it was certainly before February 6, 2012 – the date that the Board responded to the EEOC Charge.

### 5.    *Events Surrounding Ms. Thomas's Nonrenewal*

In the spring of 2012, the Board's central office advised every principal to submit any non-tenured teacher's name if the principal recommended the teacher

---

[12]  Document No. 20-13 is Ms. Weston's recollection of a conversation with another teacher, Ms. Manning, who also reported concerns about Ms. Thomas.

should be non-renewed.  Ms. Weston submitted Ms. Thomas's name on April 2, 2012.  Ms. Weston claims that she decided to recommend nonrenewal for Ms. Thomas for the reasons documented in the letter of concern (*i.e.*, written communication deficiencies, failure to follow the chain of command, and lack of professional loyalty), Ms. Thomas's "erratic" behavior throughout the year, her "Terminator" sign, her inappropriate comments to a class on the first day of school, Ms. Thomas's inability to receive constructive criticism, Ms. Thomas's interpretation of everything as a personal attack, an incident where Ms. Thomas failed to understand her evaluation requirements,[13] the episode involving strange behavior during the student crisis, and Ms. Thomas's inability to get along well with other members of Marbury's faculty.  (*See* Doc. # 16, at 14 (citing Ms. Weston's notes and deposition testimony).)

Upon review of Ms. Weston's recommendation, Mr. Agee, the newly appointed superintendent, agreed to recommend Ms. Thomas's nonrenewal to the Board.  Ms. Weston advised Ms. Thomas of the recommendation on May 18, 2012, and gave Ms. Thomas the opportunity to resign.  Ms. Thomas declined.  Mr. Agee recommended that the Board decline to renew twenty-eight teachers, including Ms. Thomas, at the Board's May 21, 2012 meeting.  The Board unanimously approved Mr. Agee's recommendation and Ms. Thomas was

---

[13] The parties do not make much of this incident, but Ms. Weston describes it in her deposition.  (*See* Weston Dep., Doc. # 20-2, at 75–79.)

informed of the decision.   Marbury replaced her with another black female the following school year.

**6.**   ***Second EEOC Charge and Judicial Complaint***

Ms. Thomas filed a second EEOC charge on May 21, 2012.   The EEOC issued a dismissal and notice of right to sue on August 7, 2012.   Ms. Thomas filed her complaint in this court on November 2, 2012.

## IV.  DISCUSSION

Title VII of the Civil Rights Act of 1964, as amended, prohibits employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1).   It further prohibits employers from retaliating against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing [thereunder]." *Id.* at § 2000e-3(a).

The Civil Rights Act of 1866, or Section 1981, guarantees "all persons . . . the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens," and it also protects against race-based employment discrimination and retaliation.   The Civil Rights Act of 1871, or Section 1983, prohibits state actors from acting in violation of federal law.   "[Section] 1981 does not provide [a] cause

of action against state actors; therefore, § 1983 constitutes the exclusive federal remedy for violation by state actors of the rights guaranteed under § 1981." *Bryant v. Jones*, 575 F.3d 1281, 1288 n.1 (11th Cir. 2009).[14]  "Both [Title VII and § 1981] have the same requirements of proof and use the same analytical framework." *Standard v. A.B.E.L. Servs., Inc*., 161 F.3d 1318, 1330 (11th Cir. 1998).  Hence, courts "need not discuss [a] plaintiff's Title VII claims separately from h[er] section 1981 and section 1983 claims" when all claims "are based on the same set of facts." *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008).[15]

Ms. Thomas has conceded her race discrimination claim, (Doc. # 21, at 4), and the Board is accordingly entitled to summary judgment as to that claim.  Ms. Thomas's retaliation and racially hostile work environment claims remain.

## A.   <u>Retaliation</u>

Where, as here, there is no direct evidence of unlawful retaliation, the plaintiff typically must use the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to show indirect evidence of

---

[14] Out of caution, the Board argues that summary judgment is due to be granted for any § 1983 claim against the Board for an official custom or policy supporting the alleged acts of discrimination or retaliation.  (Doc. # 16, at 34–37.)  Ms. Thomas clarifies that she "is not pursuing a separate claim under § 1983."  (Doc. # 21, at 4.)

[15] The Board asserts that by only mentioning the § 1981/§ 1983 claim in passing in her opposition brief, Ms. Thomas has abandoned it.  (Doc. # 22, at 1–2.)  It is unclear why the Board believes Ms. Thomas would need to devote separate analysis to the § 1981/§ 1983 claim because, as the Board acknowledges, the same legal standard applies to Title VII claims and § 1981/§ 1983 claims for retaliation and hostile work environment.

retaliation.  *See Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1264, 1268 (11th Cir. 2010).   Under the *McDonnell Douglas* framework, the plaintiff must first make a prima facie case of retaliation.  A plaintiff makes a prima facie case of retaliation under Title VII by showing that: "(1) she engaged in an activity protected under Title VII; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action." *Crawford*, 529 F.3d at 970.

But if the plaintiff makes her prima facie case of either discrimination or retaliation, "the burden shifts to the defendant to articulate a legitimate [non-retaliatory] reason for its actions." *Alvarez*, 610 F.3d at 1264.   And if the defendant proffers a non-retaliatory reason, the burden returns to the plaintiff, who must show that the proffered reason is pretextual. *Id.*  "A reason is not pretext for [retaliation] 'unless it is shown *both* that the reason was false, and that discrimination was the real reason.'" *Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)).   The plaintiff can demonstrate pretext by exposing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the defendant's reasoning. *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1348 (11th Cir. 2007).   The plaintiff may not "recast [her] employer's proffered [non-retaliatory] reasons or substitute h[er]

business judgment for that of the employer.  Provided that the proffered reason[s] [are] one[s] that might motivate a reasonable employer, [the plaintiff] must meet" each of the proffered reasons "head on and rebut [them]" as untrue.  *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc).

The Board and Ms. Thomas dispute the causal connection element of her prima facie case.  Specifically, they disagree about whether Ms. Thomas's December 28, 2011 EEOC charge occurred within sufficiently close temporal proximity to the Board's adverse employment action.  The Board asserts that late December is too far removed from the Board's May 21, 2012 vote.  Ms. Thomas asserts, however, that Ms. Weston's April 2, 2012 recommendation to Mr. Agee – not the Board's vote on Mr. Agee's proposal – is the relevant event.  Her argument reveals another potential disagreement between the parties about whether Ms. Weston's knowledge as the person recommending nonrenewal is attributable to the Board as final decisionmaker.  (*Compare* Doc. # 16, at 27 ("[T]here is no evidence that members of the Board had knowledge of any protected activity . . . ."), *with* Doc. # 21, at 21–22 (focusing exclusively on what Ms. Weston knew and when).)[16]

---

[16] The court assumes that Ms. Thomas is proceeding under the theory that "the decisionmaker [*i.e.*, the Board] followed the biased recommendation [of a recommending agent, *i.e.*, Ms. Weston] without independently investigating the complaint against the employee.  In such a case, the recommender is using the decisionmaker as a mere conduit, or 'cat's paw' to give effect to the recommender's [retaliatory] animus."  *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999); *see also Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1192 (2011) ("[I]t is axiomatic under tort law that the exercise of judgment by the decisionmaker does not prevent

It is not necessary to decide the causal connection questions, however. Assuming without deciding that Ms. Thomas establishes a prima facie case of retaliation, she is unable to rebut each of the Board's legitimate non-retaliatory reasons for not renewing Ms. Thomas's employment.  The Board offers as its legitimate non-retaliatory reasons all of Ms. Weston's motivations for recommending Ms. Thomas's nonrenewal, including:   Ms. Thomas's erratic behavior; her unprofessional written communications; her failure to follow the chain of command; her lack of professional loyalty to administrators; her inappropriate Terminator sign; her inappropriate comments to a class on the first day of school; her inability to receive criticism constructively; her failure to understand evaluation requirements on one occasion; her self-centered response during a serious crisis involving a student; and her inability to get along with other teachers.   Each of these reasons is "one that might motivate a reasonable employer."  *Chapman*, 229 F.3d at 1030.  Some of the reasons are subjective and based upon Ms. Weston's personal opinions of Ms. Thomas.  But Title VII makes allowance for subjective beliefs – even incorrect ones – so long as they are not pretext for retaliation.  *Id.* at 1033–34 ("Subjective reasons can be just as valid as objective reasons.").

---

the earlier agent's action (and hence the earlier agent's discriminatory [or retaliatory] animus from being the proximate cause of the harm.").

Ms. Thomas insists that Ms. Weston's proffered reasons are pretext for retaliation.  (*See* Doc. # 21, at 24–26.)  Ms. Thomas notes that Ms. Weston did not have any criticism of her job performance until after Ms. Thomas first complained about race discrimination in the spring of 2011 when she reported the KKK incident to Ms. Weston.  Ms. Thomas contends that a jury could infer that Ms. Weston's knowledge of the EEOC charge would stoke her sensitive feelings about "professional loyalty" and the propriety of following the "the chain of command." In other words, filing a charge of discrimination with a federal agency was a protected act that Ms. Weston conceivably would want to penalize with retaliation. Next, Ms. Thomas points to the relative nearness in time between Ms. Weston's awareness of the EEOC charge and Ms. Weston's recommendation to nonrenew Ms. Thomas's employment.[17]  Ms. Thomas asserts that Ms. Weston retaliated "at the first chance she had on April 2, 2012." (Doc. # 21, at 25.)  Ms. Thomas further alleges that Ms. Weston engaged in a "pattern of retaliatory actions" that show her propensity to retaliate.   (Doc. # 21, at 25.)   The alleged pattern includes Ms. Weston's impromptu classroom visit and evaluation on September 19, 2011, and

---

[17] "[A]lthough the presumption of [retaliation] drops out of the picture once the defendant meets its burden of production, the trier of fact may still consider the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom on the issue of whether the defendant's explanation is pretextual."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (internal citations, quotation marks, and alterations omitted).  Here, the court has declined to make a finding about the causation element of the prima facie case, but accepts Ms. Thomas's view that Ms. Weston recommended non-renewal within less than three months of learning about Ms. Thomas's EEOC charge.

Ms. Weston's practice of documenting Ms. Thomas's behavior during the 2011-12 school year. Ms. Thomas adds that Ms. Weston did not counsel other teachers who made grammatical errors.

Ms. Thomas's arguments are founded almost entirely upon her speculation that Ms. Weston disliked her for complaining and "was out to get" her. (Doc. # 21, at 25.) With the exception of the argument that other teachers made grammatical errors and were not counseled or disciplined, Ms. Thomas does not contradict any other proffered reason as false, baseless, inconsistent, or implausible. Nor does she point to other evidence that plaintiffs typically offer to establish pretext, like biased or inappropriate statements or admissions by Ms. Weston, an extraordinary departure from the Board's normal course of handling a non-tenured faculty member with unprofessional or deficient job performance issues, the existence of comparators at Marbury who were more favorably treated, or positive prior job performance appraisals that contradict Ms. Weston's perception of Ms. Thomas. Rather, Ms. Thomas mostly offers her theory of the case, which may be fine for an opening argument at a jury trial, but inadequate at the third stage of *McDonnell-Douglas*'s burden-shifting framework at summary judgment. Ultimately, Ms. Thomas fails to confront each of the Board's reasons head on, s*ee Chapman*, 229 F.3d at 1030, by showing that the reasons are false, *see Brooks*, 446 F.3d at 1163.

Accordingly, the Board's motion for summary judgment is due to be granted as to Ms. Thomas's Title VII and § 1981/§ 1983 retaliation claims.

**B.     <u>Hostile Work Environment</u>**

According to Ms. Thomas's brief, her racially hostile work environment claim arises from (1) the KKK incident in 2011, (2) Ms. Jacobs's unwelcome comments and outbursts, and (3) Ms. Weston's allegedly retaliatory dealings with Ms. Thomas during the 2011-12 school year, which Ms. Thomas characterizes as a passing of the harassment "torch" from Ms. Jacobs to Ms. Weston.  (Doc. # 21, at 28.)

A plaintiff establishes a hostile work environment under Title VII by proving that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  "To establish a prima facie case of hostile work environment racial harassment, [the plaintiff] must show: (1) that [s]he belongs to a protected group; (2) that [s]he has been subject to unwelcome racial harassment; (3) that the harassment was based on h[er] race; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a

basis for holding the employer liable." *Baker v. Ala. Dep't of Pub. Safety*, 296 F. Supp. 2d 1299, 1309 (M.D. Ala. 2003).   Although the Board disputes Ms. Thomas's ability to prove anything other than her membership in a protected class, the court will focus on whether Ms. Thomas endured harassment because of her race and whether the harassment was severe or pervasive.

### 1. *Harassment Based on Ms. Thomas's Race*

The Board contends that apart from the isolated KKK incident, Ms. Thomas endured no racially harassing mistreatment at Marbury.[18]   Aside from Ms. Thomas's "self-serving perception" of Ms. Jacobs's and Ms. Weston's race-based motives, the Board contends there is no evidence that Ms. Jacobs's or Ms. Weston's words or actions ever denigrated Ms. Thomas on account of her race. (Doc. # 16, at 31.)

---

[18] The Board has not argued that it cannot be held liable for the racially offensive acts that its students perpetrate against its employees.  Eleventh Circuit precedent suggests that there is a reason that the Board has not made that argument. *See Beckford v. Dep't of Corrs.*, 605 F.3d 951, 957–58 (11th Cir. 2010) (holding that prison could be held liable for failing to remedy a sexually hostile work environment created by its inmates, and collecting cases from other federal courts that allowed employer liability for harassment perpetrated by third parties where employers could have protected their harassed employees).

However, the Board does argue that the KKK incident, which occurred in April 2011, falls outside of the statutory time frame allowed by Title VII and that there are no continuing race-based violations to justify an extension of the relevant limitation period back in time from the filing of the EEOC charge.  (*See* Doc. # 16, at 32–33).   Nevertheless, the Board acknowledges that the KKK incident does not fall outside of the limitations period for a § 1981 claim, and the court must consider the KKK incident for purposes of that claim.  Ms. Thomas makes no response to the Board's position, but she presumably disagrees with the Board's contention that there were no continuing race-based violations after the KKK incident.

Ms. Thomas argues that she does not necessarily have to show that comments or actions have a clearly or overtly racial substance or nature, so long as the harassment occurred because of her race. That is true. But Ms. Thomas still must come forward with evidence showing that Ms. Jacobs or Ms. Weston harassed Ms. Thomas "because of [her] race." 42 U.S.C. § 2000e-2(a)(1); *see also Givens v. Chambers*, 548 F. Supp. 2d 1259, 1278 (M.D. Ala. 2008) (quoting *Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1302 (11th Cir. 2007)) ("Title VII 'does not prohibit harassment alone, however severe and pervasive. Instead, Title VII prohibits discrimination, including harassment that discriminates based on a protected category . . . .'").

In her brief, Ms. Thomas cites her deposition testimony that she never saw Ms. Jacobs treating white co-teachers like she treated Ms. Thomas. But this testimony is inadequate to prove that Ms. Jacobs was motivated by racial animus. Not seeing something does not prove that the thing does not exist. It only proves that one "never saw" the thing. Moreover, Ms. Thomas offers no evidentiary justification for her assertion that Ms. Weston harassed her because of her race.[19] The court is unaware of any other record evidence or testimony, aside from Ms.

---

[19] At this point, the court is merely assuming that Ms. Weston's criticism of Ms. Thomas's lack of professionalism or job performance amounts to "harassment." Unlike Ms. Jacobs, Ms. Weston never yelled at Ms. Thomas, confronted her in an intimidating way, or made inappropriate remarks to or about her.

Thomas's perceptions,[20] that Ms. Jacobs or Ms. Weston harassed Ms. Thomas because Ms. Thomas is black. Therefore, Ms. Thomas has failed to demonstrate that she was harassed by Ms. Jacobs or Ms. Weston because of her race, and the only race-based harassment issue remaining is the KKK incident.[21]

## 2. *Harassment that is Sufficiently Severe or Pervasive*

The Board argues that the KKK incident does not amount to harassment that is sufficiently severe or pervasive to support a hostile work environment claim. The test for "[e]stablishing that harassing conduct was sufficiently severe or pervasive [. . .] includes a subjective and an objective component." *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (citing *Harris*, 510 U.S. at 21–22). The victimized employee "must subjectively perceive the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable." *Id.* (internal

---

[20] Examples of Ms. Thomas's perceptions include her beliefs that Ms. Jacobs did not think a black person could be a good teacher, (Thomas Dep., at 28), that Ms. Jacobs thought a black teacher should have to work harder than a white teacher during her planning period, (Thomas Dep., at 34), or that Ms. Weston did not honor Ms. Thomas's graduation because Ms. Weston refused to recognize a black woman's accomplishment, (Thomas Dep, at 114).

[21] Even if there was some reason to infer that Ms. Jacobs harassed Ms. Thomas because of her race – and there is not – Ms. Thomas's complaints about her co-teacher and principal would still fail on the fourth element of the hostile work environment claim. Viewing the facts in the light most favorable to Ms. Thomas, Ms. Jacobs behaved rudely, got underneath Ms. Thomas's skin, and intimidated her. But the Supreme Court has repeatedly held that "simple teasing, offhand comments, and isolated incidents (unless extremely serious)" are not actionable under Title VII. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal citation and quotation marks omitted). The standard for judging hostile workplace behavior is high because Title VII is not a "general civility code." *Id.*

quotation marks omitted).   The court must objectively judge the severity of the alleged harassment "from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances."   *Id.* (internal quotation marks omitted).   The Supreme Court and the Eleventh Circuit have identified four factors to assist in determining the objective reasonableness of the plaintiff's perception of severity.   They are "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance."   *Id.*[22]

Here, there is no question that Ms. Thomas subjectively perceived her subjection to racial harassment to be so severe or pervasive that the harassment interfered with her employment.   The focus turns to the objective reasonableness of her perception.

The KKK threat posed to Ms. Thomas by an unidentified student was somewhat severe.[23]   The student's drawing and written threat were physically threatening and humiliating.   But the incident occurred only once, and nothing

---

[22] The standard is the same for a hostile work environment claim arising under § 1981. *See Malone v. K-Mart Corp.*, 51 F. Supp. 2d 1287, 1306 (M.D. Ala. 1999).

[23] The KKK threat would have been more severe if it were clear that the student who made the threat intended for Ms. Thomas to see the threat, or if a student directly confronted Ms. Thomas with the threat, or if there was reason to believe that a student actually had a connection to the KKK.   But here, Ms. Thomas found a student's drawing and message in a textbook, no one personally threatened her, and the threat never materialized in harmful action against Ms. Thomas.

comparable to it occurred again during Ms. Thomas's employment at Marbury.  A single, isolated incident over a three-year span of employment is anything but "pervasive" harassment.  The court is hard pressed to find a similar hostile work environment case that survived an employer's motion for summary judgment.  *See Mack v. ST Mobile Aerospace Eng'g, Inc.*, 195 F. App'x 829, 838 (11th Cir. 2006) (quoting *Miller*, 277 F.3d at 1276) ("There is 'not simply some magic number of racial or ethnic insults' that preclude summary judgment, but rather 'it is *repeated incidents* of . . . harassment that continue despite the employee's objections [that] are indicative of a hostile work environment.'" (emphasis added)); *Williams v. Russell Corp.*, 218 F. Supp. 2d 1283, 1293 (M.D. Ala. 2002) (dismissing hostile work environment claim based on an isolated incident).  In view of the one incident of unwelcome, overtly racial harassment, it was objectively unreasonable for Ms. Thomas to allow the KKK incident to interfere with her long-term job performance.

Therefore, in view of the totality of the circumstances, Ms. Thomas fails to prove that she endured severe or pervasive racial harassment while employed by the Board.  The Board's motion for summary judgment is due to be granted as to Ms. Thomas's Title VII and § 1981/§ 1983 hostile work environment claims.

## V.  CONCLUSION

In accordance with the foregoing analysis, it is ORDERED that the Board's motion for summary judgment (Doc. # 15) is GRANTED.

A separate final judgment will be entered.

DONE this 15th day of April, 2014.

/s/ W. Keith Watkins
_____
CHIEF UNITED STATES DISTRICT COURT